UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

!
!
CALVIN JEROME LESEARS,

       Petitioner,

v.                            Case No. 14-14365

LORI GIDLEY,              HON. MARK A. GOLDSMITH

       Respondent.

_____/

**OPINION & ORDER**
**DENYING THE AMENDED HABEAS CORPUS PETITION,**
**DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY,**
**AND DENYING LEAVE TO APPEAL IN FORMA PAUPERIS**

Petitioner Calvin Jerome Lesears, currently confined at the Chippewa Correctional Facility in Kincheloe, Michigan, filed a pro se amended habeas corpus petition under 28 U.S.C. § 2254 (Dkt. 12). The pleading challenges Petitioner's Genesee County convictions for first-degree, premeditated murder, Mich. Comp. Laws § 750.316(1)(a); carrying a concealed weapon (CCW), Mich. Comp. Laws § 750.227; and possessing a firearm during the commission of a felony (felony-firearm), Mich. Comp. Laws § 750.227b. Petitioner raises seven claims regarding the sufficiency of the evidence at his trial, the admission or omission of certain evidence, his trial and appellate attorneys' performances, and his right to a public trial.

Respondent Lori Gidley urges the Court to deny relief because Petitioner's claims lack merit, are not cognizable on habeas review, are procedurally defaulted, or were rejected by the state courts in objectively reasonable decisions (Dkts. 5, 15.) The Court agrees that Petitioner's claims lack merit or are procedurally defaulted and that the state courts' rejections of Petitioner's

claims were objectively reasonable.  Accordingly, the Court denies the amended petition, declines

to issue a certificate of appealability, and denies leave to appeal in forma pauperis.

## I.  BACKGROUND

The charges against Petitioner arose from the fatal shooting of Gregory Ingram in Flint,

Michigan on February 26, 2010.  Petitioner was tried with two co-defendants, Gary Robinson and

Dequeze Dixon, in Genesee County Circuit Court.[1]  The Michigan Court of Appeals accurately

summarized the testimony at trial as follows:

> The primary witness was Jason Sutton, who was present during the murder but uninvolved.  He testified that he knew Robinson and Dixon already at the time, but he discovered LeSears's identity later.  Sutton testified that he was picked up by defendants while walking home.  Dixon was driving a vehicle owned by his girlfriend, Devonda Jiles.  Either Dixon or Robinson told Sutton, "If we didn't know who you was, we were going to get you."  They drove past the victim, at which point Dixon said, "There's Greg, let's get on him."  Robinson got out of the car first, and then Dixon turned the car around and parked, whereupon Dixon and LeSears also got out.  Sutton remained in the vehicle using his telephone.
>
> Sutton testified that he heard a barrage of gunfire from multiple guns: an assault rifle, a shotgun, and a handgun.  He saw all three defendants outside shooting the victim.  A medical examination would later identify the victim's cause of death as multiple gunshot wounds from at least three different kinds of guns.  When defendants returned to the vehicle, Sutton observed Robinson with an assault rifle, Dixon with a shotgun, and LeSears with a handgun.  Dixon advised Sutton that they would kill him if he told anyone about the events of the evening.  They then dropped Sutton off at his house.  Sutton continued to associate with defendants out of fear that they would believe he had told authorities about the shooting.  A few weeks later, Sutton was again in the same vehicle with Dixon and Sutton's cousin, when police attempted to pull the vehicle over, apparently for unrelated reasons.  All of the occupants jumped out and fled; Sutton was the only one apprehended.  He was taken into custody for fleeing and eluding, and Jiles's car was impounded.
>
> While incarcerated, Sutton asked to talk to the police about the victim's murder.  After Sutton was interviewed, Robinson was arrested two days later, and Dixon was arrested later that same day.  Sutton subsequently picked LeSears out of a photographic lineup as the third individual, asserting that he was about 80 percent certain.  LeSears was arrested about a month later for an unrelated matter, after

---

[1]  Each defendant had his own jury.

which Sutton identified LeSears with certainty out of a physical lineup.  After being informed that he had been identified, LeSears explained that he had been attempting to contact the police "for a few days," wishing to speak about the homicide.  An interview was conducted and recorded, and LeSears made a statement indicating, among other things, that he had not been attempting to hit the victim, but rather fire in his direction "trying to scare him off."

People v. Sutton, No. 305314, 2013 WL 4866270, at *1 (Mich. Ct. App. Sept. 12, 2013).

None of the defendants testified, and only Dixon presented a witness.[2]  Petitioner's defense was that he did not intend to kill the victim and that he fired at the victim for two reasons:  (i) to warn and scare the victim into running away; and (ii) because he feared that his co-defendants would kill him if he did not participate in the shooting.  Petitioner also maintained that Sutton's testimony was not credible because he allegedly gave inconsistent statements, lied, and benefitted from being a witness.

On May 16, 2011, the jury found Petitioner guilty, as charged, of first-degree, premeditated murder, CCW, and felony-firearm.  See 5/16/11 Trial Tr. at PageID.1703-—1704 (Dkt. 6-20).  On June 21, 2011, the trial court sentenced Petitioner to two years in prison for the felony-firearm conviction, followed by life imprisonment for the murder, and two to five years in prison for the CCW conviction.  See Sentence Tr. at PageID.1713–1714 (Dkt. 6-21).

On appeal from his convictions, Petitioner argued through counsel that:  (i) the prosecution failed to prove that he caused the death, (ii) the trial court erred when it determined that his statement to the police was admissible, and (iii) the trial court violated the rule of completeness by admitting only the incriminating portions of his statement to the police.  The Michigan Court of

---

[2]  The witness was a private investigator retained by Dixon's attorney.  He testified that, two days earlier, he took photographs of some Nike athletic shoes in defense counsel's office.

Appeals adjudicated these claims on the merits and affirmed Petitioner's convictions in an unpublished, per curiam opinion.  See LeSears, 2013 WL 4866270.

Petitioner raised the same issues in an application for leave to appeal in the Michigan Supreme Court.  On January 31, 2014, the State Supreme Court denied leave to appeal because it was not persuaded to review the issues.  See People v. LeSears, 843 N.W.2d 206 (Mich. 2014).

On November 12, 2014, Petitioner commenced this case, raising the same issues that he had presented to the state courts on direct review.  See Pet. (Dkt. 1).  Several months after Respondent filed an answer in opposition to the petition, Petitioner moved to stay the federal proceeding and to hold his habeas petition in abeyance while he returned to state court and pursued post-conviction remedies for a few new claims.  See Mot. (Dkt. 8).  At the time, former United States District Judge John Corbett O'Meara was assigned to the case, and on January 29, 2016, Judge O'Meara granted Petitioner's motion and closed this case for administrative purposes.  See Order (Dkt. 9).

Petitioner subsequently filed a motion for relief from judgment in the state trial court.  He alleged that: (i) trial counsel was ineffective for failing to suppress a suggestive pretrial identification of him; (ii) the prosecutor deprived him of a fair trial by eliciting inflammatory evidence of threats, and defense counsel's failure to object to the testimony was ineffective assistance; (iii) the exclusion of the public from his trial violated his constitutional right to a public trial; in the alternative, defense counsel was ineffective for failing to object to the courtroom closure; and (iv) he was denied his right to effective assistance of appellate counsel by counsel's failure to raise significant and compelling issues on appeal.  See Mot. (Dkt. 16-2).  On May 13, 2016, the state trial court denied Petitioner's motion for relief from judgment because Petitioner's

claims lacked merit and because Petitioner had failed to meet the requirements of Michigan Court Rule 6.508(D)(3).  See Order (Dkt. 16-3).

Petitioner appealed the trial court's decision, but on December 20, 2016, then-Chief Judge Michael J. Talbot dismissed Petitioner's application for leave to appeal as untimely.  See People v. Lesears, No. 335993, at PageID.2181 (Mich. Ct. App. Dec. 20, 2016) (Dkt. 16-4).  On October 31, 2017, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the issues.  See People v. Lesears, 902 N.W.2d 622 (Mich. 2017).

On January 30, 2018, Petitioner returned to federal court with a motion to re-open this case (Dkt. 11), and an amended habeas petition (Dkt. 12).  Petitioner raised the following seven claims in his supporting brief:  (i) he was denied due process because the prosecution failed to prove that he caused the victim's death; (ii) the trial court erred when it admitted in evidence his involuntary statement; (iii) the trial court violated the rule of completeness when it admitted only a statement that contained incriminating statements; (iv) trial counsel was ineffective for failing to move to suppress a suggestive pretrial identification; (v) the prosecutor deprived him of a fair trial by eliciting inflammatory evidence of threats unconnected to him, and defense counsel's failure to object amounted to ineffective assistance; (vi) the exclusion of the public from his trial violated his right to a public trial; alternatively, defense counsel was ineffective for failing to object to the closure; and (vii) appellate counsel was ineffective for failing to raise significant and obvious issues on appeal.  See Brief in Support of Am. Pet. at PageID.1909–1967 (Dkt. 12).

The case was reassigned to the undersigned after Judge O'Meara retired, and on July 12, 2018, the Court granted Petitioner's motion to re-open this case.  See Order (Dkt. 14).  Respondent then filed an answer to Petitioner's four new claims.  See Answer in Opp'n to Pet. for Writ of

Habeas Corpus (Dkt. 15).  Respondent argues: (i) habeas claims one and two lack merit, and the state appellate court's adjudication of those claims was objectively reasonable; (ii) claim three is not cognizable on habeas review, and the state appellate court reasonably rejected the claim on the merits; (iii) claims four through six are procedurally defaulted and meritless, and the state court's rejection of those claims was reasonable; and (iv) claim seven is meritless, and the state trial court's rejection of the claim was reasonable.  See Answer in Opp'n to Pet. for Writ of Habeas Corpus at PageID.42–43 (Dkt. 5); Answer in Opp'n to Pet. for Writ of Habeas Corpus at PageID.2050–2052 (Dkt. 15).

## II.  STANDARD OF REVIEW

Section 2254(d) of Title 28, United States Code, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially

6

indistinguishable facts.   Williams v. Taylor, 529 U.S. 362, 405 (2000).   An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case."   Id. at 409.   "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."   Id. at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system."   Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).   Thus, AEDPA "imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt."   Renico v. Lett, 559 U.S. 766, 773 (2010) (punctuation modified, citations omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."   Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).   "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable."   Id. at 102.   Furthermore, pursuant to "§ 2254(d), a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."   Id.   To obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."   Id. at 103.

Finally, a state court's factual findings are presumed correct under 28 U.S.C. § 2254(e)(1), unless the petitioner rebuts the presumption with clear and convincing evidence.

## III.  DISCUSSION

### A.  Sufficiency of the Evidence

Petitioner alleges first that his conviction for first-degree murder violated his right to due process because the prosecution failed to prove that his acts or encouragement, either as a principal or an aider and abettor, caused the victim's death.  Petitioner contends that there was insufficient evidence of premeditation and deliberation, that he was merely present at the scene, and that he neither overtly, nor silently, supported the killing.  He also contends that he may have shot into the ground, but the physical evidence did not support the conclusion that he fired the fatal gunshots.  Although the Michigan Court of Appeals found no merit in Petitioner's claim on direct review, Petitioner claims that the state appellate court's adjudication of his claim was based on an unreasonable determination of the facts.  See Brief in Support of Am. Pet. at PageID.1921–1927.

### 1.  Legal Framework

The Supreme Court has held "that the Due Process Clause [of the Fourteenth Amendment] protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  Following Winship, the critical inquiry on review of a challenge to the sufficiency of the evidence supporting a criminal conviction  "is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).

8

"[R]eview of a state-court conviction for sufficiency of the evidence is very limited" because federal habeas courts "give two layers of deference to state-court convictions." Thomas v. Stephenson, 898 F.3d 693, 698 (6th Cir. 2018). "First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Coleman v. Johnson, 566 U.S. 650, 651 (2012) (punctuation modified, citation omitted). Second, on habeas review, a federal court may overturn a state court decision rejecting a sufficiency of the evidence challenge "only if the state court decision was objectively unreasonable." Id. (punctuation modified, citation omitted).

The Jackson "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16. To establish first-degree, premeditated murder in Michigan, "the prosecution must prove that the defendant intentionally killed the victim and the act of killing was deliberate and premeditated." People v. Haywood, 530 N.W.2d 497, 503 (Mich. Ct. App. 1995).

"To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." People v. Morrin, 187 N.W.2d 434, 449 (Mich. Ct. App. 1971) (internal and end footnotes omitted). "Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a 'second look.'" People v. Oros, 917 N.W.2d 559, 566 (Mich. 2018). "[P]remeditation and deliberation may be inferred from all the facts and circumstances surrounding the incident, including the parties' prior

relationship, the actions of the accused both before and after the crime, and the circumstances of the killing itself." Haywood, 530 N.W.2d at 503 (citations omitted). The type of weapon used and the location of the wounds inflicted may also be considered, People v. Berry, 497 N.W.2d 202, 204 (Mich. Ct. App. 1993), and the amount of time for the defendant to take a "second look" at his actions may be minimal, People v. Gonzalez, 444 N.W.2d 228, 230 (Mich. Ct. App. 1989).

Petitioner was charged as a principal and an aider and abettor.

"Aiding and abetting" describes all forms of assistance rendered to the perpetrator of a crime and comprehends all words or deeds that might support, encourage, or incite the commission of a crime. . . . To support a finding that a defendant aided and abetted a crime, the prosecutor must show that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement. An aider and abettor's state of mind may be inferred from all the facts and circumstances. Factors that may be considered include a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime.

People v. Carines, 597 N.W.2d 130, 135 (Mich. 1999) (citation omitted). Mere presence during the commission of a crime does not render a person liable as a participant in the crime. Miller v. Sweitzer, 22 Mich. 391, 394 (1871).

## 2. Application of the Law

There was more than sufficient evidence of premeditated murder in this case. Sutton identified Petitioner in a group of six photographs and stated that he was 80% sure of his selection. See 4/28/11 Trial Tr.at PageID.920–924 (Dkt. 6-11). Sutton subsequently picked Petitioner out of a live lineup and stated that he was 100% sure of his selection. See id. at PageID.924–925.

At trial, Sutton testified that on the night of the shooting, he was walking down the road when the defendants approached him in a car and agreed to give him a ride home. During the

10

drive, Dixon said, "There's Greg.  Let's get on him."  Robinson then jumped out of the car, and after Dixon turned the car around, both Dixon and Petitioner got out of the car.  Sutton subsequently heard a lot of gunfire, and when he looked out the back window of the car, he saw Robinson, Dixon, and Petitioner standing near the victim and shooting the victim.  When the three men returned to the car, Robinson had an assault rifle, Dixon had a shotgun, and Petitioner had a handgun.  Dixon then told Sutton that he would be killed if he said anything about the shooting. See id. at PageID.858–883, 896.

Petitioner's statement to Sergeants Mitch Brown and Jeff Collins on June 23, 2010, was consistent with Sutton's testimony.  Petitioner described being in the car with Dixon and Robinson, picking up Sutton, seeing Ingram walking down the street, and hearing Dixon say that he was going to blow off the victim's head.  See 6/23/10 Statement of Calvin Jerome Lesears at PageID.97–105 (Dkt. 5-1).  Elsewhere during the interview, Petitioner said that someone in the front seat of the car had said, I'm gonna kill him."  See id. at PageID.140.  Petitioner admitted to the officers that he had fired a gun at or near the victim.  See id. at PageID.105, 110, 115.

A videotape of the officers' interview with Petitioner on June 23, 2010, was played for Petitioner's jury, and the jurors were given a transcript of the videotape to follow during the playing of the videotape.  See 5/4/11 a.m. Trial Tr. at PageID.1131–1134 (Dkt. 6-13).  Petitioner's written statement was prepared during the June 23, 2010 interview, and it was admitted in evidence along with his diagram of the crime scene.  See id. at PageID.1132–1133.  Although Petitioner stated that he shot at the ground to scare the victim into running away from Dixon and Robinson, the jury could reasonably have concluded that Petitioner's statement inaccurately minimized his involvement in the shooting.

The prosecution's expert witnesses, moreover, supported the prosecutor's theory that Petitioner participated in the shooting.  The medical examiner who performed the autopsy testified that at least three weapons were used to shoot the victim.  See 5/4/11 p.m. Trial Tr. at PageID.1228–1229 (Dkt. 6-14).  Some of the bullet wounds were caused by large caliber guns, but other gunshot wounds were consistent with a small-caliber firearm.  See id. at PageID.1211–1212.  The medical examiner also opined that any gunshot wound can be potentially fatal without treatment and that all the gunshot wounds at least contributed to the victim's death.  See id. at PageID.1227–1228.  A firearm and tool mark examiner agreed that at least three firearms were used during the incident.  See 5/5/11 Trial Tr. at PageID.1321–1322 (Dkt. 6-15).

A rational trier of fact could have concluded from the evidence that Petitioner and his co-defendants shot the victim and that Petitioner either intended to kill the victim or aided and abetted his co-defendants in killing the victim, knowing that his co-defendants intended to kill the victim.  Thus, there was sufficient evidence to support the jury's verdict.

Even if the Court had concluded otherwise, the state appellate court's adjudication of Petitioner's claim on the merits was objectively reasonable.  The Michigan Court of Appeals stated:

> [D]efendant had a handgun not only accessible and available, but in fact ready.  The other two defendants also had guns, a fact of which LeSears was impliedly aware.  After Dixon said, "let's get him," Robinson was the first to exit the vehicle.  LeSears did not: rather, Dixon turned the vehicle around and parked.  The length of time necessary to show premeditation and deliberation need only be sufficient for a reasonable person to be able to take a "second look" at the situation.  People v. Tilley, 405 Mich. 38, 45; 273 NW2d 471 (1979). We find that LeSears had that opportunity.

Lesears, 2013 WL 4866270, at *2.

The Court of Appeals was "not impressed with the contention that LeSears essentially 'shot to miss.'"  Id.  The Court of Appeals pointed out that "Sutton's testimony [was] that he saw all three defendants standing <u>over</u> the victim and firing their guns" and that there was "evidence of handgun-inflicted injuries to the victim." Id. (emphasis in original).  As for Petitioner's intent, the Court of Appeals stated:

> LeSears was unambiguously aware of the crime, and even if he had not in fact intended to shoot the victim, he participated in the crime and impliedly approved of it by standing over Ingram with his codefendants.  Simply because the medical examiner could not determine which bullet was the immediate cause of Ingram's death is irrelevant given the numerous wounds inflicted and their location, which reasonably leads to the conclusion that death would be the natural and probable consequence of defendants' actions.

Id. at *3.

The decision of the Michigan Court of Appeals is supported by the record, it was objectively reasonable, and it was based on a reasonable determination of the facts.  Petitioner, therefore, has no right to relief on his claim.

**B.  Petitioner's Statement to the Police**

Petitioner alleges next that the trial court erred when it admitted into evidence his statement to the police.  Petitioner contends that his statement was involuntary and obtained in violation of his constitutional rights, because Sergeant Brown interrogated him without counsel present, despite knowing that Petitioner was already represented by counsel in another matter.  Petitioner also contends that the result of the trial would have been different if his statement had not been admitted and that the state appellate court's decision was based on an unreasonable determination of the facts.  <u>See</u> Brief in Support of Am. Pet. at PageID.1927–1934.  The Michigan Court of Appeals adjudicated Petitioner's claim on the merits during the direct appeal and found no error.

13

### 1. Clearly Established Federal Law

The Fifth Amendment to the United States Constitution states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V. "To give force to the Constitution's protection against compelled self-incrimination, the Court established in [Miranda v. Arizona, 384 U.S. 436 (1966)] 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'"  Florida v. Powell, 559 U.S. 50, 59 (2010) (quoting Duckworth v. Eagan, 492 U.S. 195, 201 (1989)).  "Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Miranda, 384 U.S. at 444.

"Critically, however, a suspect can waive these rights.  To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary . . . ."  Maryland v. Shatzer, 559 U.S. 98, 104 (2010) (punctuation modified, citations omitted).  One way an accused person can waive his or her constitutional rights after expressing a desire to deal with the police only through counsel is by initiating "further communication, exchanges, or conversations with the police."  Edwards v. Arizona, 451 U.S. 477, 484–485 (1981).

The test for voluntariness of a confession is whether the confession is the product of an essentially free and unconstrained choice by its maker.  Schneckloth v. Bustamonte, 412 U.S. 218, 225–226 (1973).  When determining whether a defendant's will was overborne in a particular case, courts must assess the totality of the circumstances, including "the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional

rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep." Id. at 226 (citations omitted). "In a federal habeas action, the burden of proving that the confession was involuntary rests with the petitioner," and "voluntariness need only be proven by a preponderance of the evidence." Boles v. Foltz, 816 F.2d 1132, 1136 (6th Cir. 1987).

### 2. Application

At Petitioner's pretrial suppression hearing, Sergeant Brown testified that he first met Petitioner on June 19, 2010.  At the time, Petitioner was a suspect in the murder case, but he had been arrested on an unrelated fleeing and eluding matter.  Brown and Sergeant Jeff Collins interviewed Petitioner on the new fleeing and eluding incident and then the homicide.  Brown advised Petitioner of his constitutional rights before interviewing him, and Petitioner stated that he understood his rights and would talk with Brown without an attorney present.  Petitioner did not say that he wished to remain silent, that he wanted to stop talking, or that he wanted an attorney, but he also did not admit any involvement in the homicide.  The interview was audiotaped and videotaped.  See 4/19/11 Suppression Hr'g Tr. at PageID.344–351 (Dkt. 6-6).

Continuing, Brown explained that Petitioner participated in a line-up on June 23, 2010, and after Petitioner learned that he had been identified in the line-up, he informed Brown that he had been trying to contact Brown or Sergeant Collins and that he wanted to talk about the homicide. Petitioner was then transported to the Flint Police Department and interviewed a second time.  Like the first interview, the second interview was audiotaped and videotaped.  Brown once again read Petitioner's constitutional rights to him, and Petitioner again stated that he understood his rights. At no time did Petitioner say that he wished to have an attorney present or to remain silent.  In

15

fact, he spoke freely and did not mention that he had an attorney.  Brown did not threaten or promise Petitioner anything at either one of the interviews.  See id. at PageID.351–359.

As for the line-up, Petitioner did not say that he did not want to appear in one.  An attorney represented Petitioner at the line-up, and Petitioner talked with the attorney.  Brown did not know the nature of Petitioner's conversation with the line-up attorney, but the line-up attorney did not object to the line-up.  See id. at PageID.359–363.

Petitioner testified at the hearing that he first met Brown in jail on June 19, 2010, after he was arraigned on two assault charges and a fleeing and eluding charge that arose from an incident at Ballenger Park.  By then, he had been to court in the Ballenger Park case and was represented by counsel.  He and Brown talked about both cases, and he agreed to participate in a line-up because he thought it was for the Ballenger Park case.  He told Brown that Brown would have to talk to his attorney about the murder case, and when Brown asked him whether he knew Dixon and Robinson, he denied knowing them.  See id. at PageID.366–372.

Petitioner further testified that, at the line-up, someone introduced himself, but he did not know the person was an attorney.  He also did not understand that the line-up was about the murder case until Brown told him that he had been identified in the line-up as the person who had been in the backseat of the car.  He did tell Brown that he had been trying to reach him and wanted to talk to him, but it was the Ballenger Park case that he wanted to discuss, not the murder case.  See id. at PageID.373. Petitioner, nevertheless, admitted that he did not tell Brown on June 23 that he wanted to talk to his attorney.  See id. at PageID.374.

On the second day of the suppression hearing, Petitioner admitted that during the June 19, 2010 interrogation, Brown had read the Miranda rights to him and that he had agreed to talk to

Brown.  He thought that Brown read his <u>Miranda</u> rights to him again on June 23, 2010, and he admitted that he told Brown he was willing to talk without an attorney present, but he claimed that he thought they were going to talk about the Ballenger Park case.  Petitioner also admitted that he was offered food or a drink.  Although he claimed that someone had threatened to kill his sister if he did not make certain admissions, he testified that Sutton's cousin had made the threat and that neither Brown, nor Sergeant Collins, had threatened him with force or violence.  <u>See</u> 4/20/11 Suppression Hr'g Tr. at PageID.572–591 (Dkt. 6-8)

The transcript of Petitioner's second statement to Sergeants Brown and Collins indicates that the interview lasted 75 minutes.  During that time, Petitioner was offered something to eat or drink three times.  <u>See</u> Statement of Calvin Jerome Lesears taken June 23, 2010 at PageID.90, 125, 143–145 (Dkt. 5-1).  The interview began with a discussion about Petitioner's attempts to contact Brown on the previous day.  <u>See id.</u> at PageID.90–94.  Brown subsequently advised Petitioner of his constitutional rights, and during that process, he informed Petitioner that they would be talking about the incident with "Greg" getting shot.  <u>See id.</u> at PageID.96.  Brown encouraged Petitioner to interrupt Brown if he did not understand something.  <u>Id.</u> Petitioner then waived his right to remain silent and his right to have counsel present, <u>see id.</u> at PageID.96–97, and when Brown asked Petitioner what happened on the night in question, Petitioner proceeded to describe his and his co-defendants' actions before, during, and after the shooting.  <u>See id.</u> at PageID.97–115.  At no time did Petitioner request the presence of counsel or ask to stop the interview.  In fact, he stated that he felt better for having talked about what had happened.  <u>See id.</u> at PageID.116.

After Petitioner's oral admissions, he and Sergeant Brown drafted a written statement that described the events before, during, and after the shooting.  <u>See id.</u> at PageID.122–156.  Then

Petitioner indicated that he wanted to write a letter to the prosecutor, and in his letter to the prosecutor, he apologized for what happened.  He also stated that he had tried to scare the victim so that the victim would run away, that he did not mean to hurt the victim, and that he did the best he could because he did not want to get killed also.  See id. at PageID.157-160.  The interview concluded with Petitioner acknowledging that Sergeant Brown had not promised him anything or threatened him to induce his statement.  See id. at PageID.161.

The record fails to support Petitioner's contention that his statement to the police officers was involuntary or obtained in violation of his rights to remain silent and to have counsel present. The Michigan Court of Appeals, therefore, reasonably concluded that the trial court did not err in admitting Petitioner's inculpatory statement to Sergeant Brown on June 23, 2010.

The Court of Appeals also concluded that any error was harmless, because Sutton incriminated Petitioner, and Sutton's testimony, if believed, was sufficient to convict Petitioner. On habeas review, an error is harmless unless it had a "substantial and injurious effect or influence" on the jury's verdict.  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).   Furthermore, "[s]tate courts' harmless-error determinations are adjudications on the merits, and therefore federal courts may grant habeas relief only where those determinations are objectively unreasonable."  O'Neal v. Balcarcel, 933 F.3d 618, 624 (6th Cir. 2019).  The testimonial and physical evidence at Petitioner's trial was substantial without Petitioner's statement to the police officers.   Therefore, the state appellate court's harmless-error analysis was objectively reasonable, and for this additional reason, Petitioner is not entitled to relief on his claim.

### C.  The Rule of Completeness

The third habeas claim alleges that the trial court erred when it admitted Petitioner's incriminating statement from June 23, 2010, but not his June 19, 2010, statement. Petitioner contends that that the omission of his first statement violated Michigan's rule of completeness, which states: "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Mich. R. Evid. 106. According to Petitioner, he was entitled to have the jury hear his complete statement, which included the earlier exculpatory portion of the conversations. See Brief in Support of Am. Pet. at PageID.1935–1939. The Michigan Court of Appeals adjudicated Petitioner's claim on the merits during the direct appeal and rejected it.

Federal habeas courts usually do not question state-court rulings on the admission of evidence under state law, Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir. 1988), and the contention that the state court violated Michigan's Rules of Evidence is not a cognizable claim on federal habeas corpus review, Hall v. Vasbinder, 563 F.3d 222, 239 (6th Cir. 2009). When "conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991). "[F]ederal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780 (1990).

Although Petitioner cites some federal decisions to support his claim, those decisions interpret Federal Rules of Evidence 401 and 402, not the Federal Constitution. Furthermore, this Court is bound by the state court's interpretation of state law, Bradshaw v. Richey, 546 U.S. 74,

76 (2005), and the Michigan Court of Appeals determined that the trial court did not err in denying Petitioner's request to provide his exculpatory statement.  The Court of Appeals stated that the rule of completeness was not applicable because the admitted statement was already complete, and Petitioner wanted to admit a completely different statement.  <u>Lesears</u>, 2013 WL 4866270, at *4.

 "[S]tates have wide latitude with regard to evidentiary matters under the Due Process Clause," <u>Wilson v. Sheldon</u>, 874 F.3d 470, 476 (6th Cir. 2017), and "the Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules," <u>Marshall v. Lonberger</u>, 459 U.S. 422, 438 n. 6 (1983).  Petitioner, therefore, is not entitled to relief on his claim.

### D.  Claims Four through Six

Petitioner's fourth claim alleges that trial counsel was ineffective for failing to properly move to suppress a suggestive pretrial procedure.  <u>See</u> Brief in Support of Am. Pet. at PageID.1940–1948.  Petitioner's fifth claim alleges that the prosecutor deprived him of a fair trial by eliciting inflammatory evidence of threats made to Sutton and that defense counsel's failure to object to the prejudicial testimony was ineffective assistance.  <u>See</u> <u>id.</u> at PageID.1949–1957.  The sixth habeas claim alleges that the exclusion of the public during Petitioner's trial violated his constitutional right to a public trial; in the alternative, defense counsel was ineffective for failing to object to the courtroom closure.  <u>See</u> <u>id.</u> at PageID.1958–1962.

Petitioner raised these claims for the first time in his post-appellate motion for relief from judgment.  The trial court denied the motion in part because Petitioner did not raise the claims on direct appeal.  Respondent, therefore, argues that claims four, five, and six are procedurally defaulted.

20

### 1.  Procedural Default

In the habeas context, a procedural default is "a critical failure to comply with state procedural law." Trest v. Cain, 522 U.S. 87, 89 (1997).  Pursuant to the doctrine of procedural default, "a federal court will not review the merits of [a state prisoner's] claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." Martinez v. Ryan, 566 U.S. 1, 9 (2012).

Before the Court can find that Petitioner procedurally defaulted claims four through six, the Court must conclude that: (i) Petitioner failed to comply with a state procedural rule; (ii) the Michigan state courts enforced the rule; (iii) the Michigan procedural rule is an adequate and independent state ground for denying review of Petitioner's federal constitutional claims; and (iv) Petitioner cannot show cause and prejudice excusing the default." Williams v. Burt, 949 F.3d 966, 972–973 (6th Cir. 2020).  "To determine whether a state procedural rule was applied to bar a habeas claim, [courts] look to the last reasoned state court decision disposing of the claim." Henderson v. Palmer, 730 F.3d 554, 560 (6th Cir. 2013) (punctuation modified, citation omitted).

The state procedural rule at issue here is Michigan Court 6.508(D)(3), which reads in part as follows:

> **(D) Entitlement to Relief.**  The defendant has the burden of establishing entitlement to the relief requested.  The court may not grant relief to the defendant if the motion
> . . . .
>
> > (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates
> >
> > > (a) good cause for failure to raise such grounds on appeal or in the prior motion, and

21

>        (b) actual prejudice from the alleged irregularities
>        that support the claim for relief.

Mich. Ct. R. 6.508(D)(3).

Petitioner violated this rule by raising his fourth, fifth, and sixth claims for the first time in

his post-conviction motion, instead of, in his appeal of right.  This violation of Rule 6.508(D)(3)

satisfies the first procedural-default factor.

The state trial court was the last state court to issue a reasoned decision on Petitioner's

fourth, fifth, and sixth claims.  The trial court rejected the claims because Petitioner did not raise

those claims during the direct appeal and because he did not show "good cause" for his failure to

comply with Rule 6.508(D)(3) and "actual prejudice."  This ruling constituted enforcement of Rule

6.508(D).  Although the trial court also briefly analyzed Petitioner's claims and found no merit in

them, that alternative holding does not require this Court to disregard the state court's procedural

ruling.  Coe v. Bell, 161 F.3d 320, 330 (6th Cir. 1998); see also Harris v. Reed, 489 U.S. 255, 264

n.10 (1989).

The state trial court invoked Rule 6.508(D)(3) as one basis for its decision.  Under Harris

v. Reed, the trial court's reliance on Rule 6.508(D)(3) satisfies the second procedural-default factor

even though the trial court also reached the alternative conclusion that Petitioner's claims lacked

merit.

The third procedural-default factor also is satisfied, because Rule 6.508(D) is an adequate

and independent ground on which state courts may rely to foreclose review of federal

constitutional claims.  Howard v. Bouchard, 405 F.3d 459, 477 (6th Cir. 2005).  Therefore, to

prevail on his procedurally defaulted claims, Petitioner must show "cause" for his state procedural error and resulting prejudice.

### 2. "Cause" for the Procedural Default

Petitioner alleges in his seventh claim that his appellate attorney's ineffectiveness was "cause" for his state procedural default. See Brief in Support of Am. Pet. at PageID.1963. Constitutionally ineffective assistance of counsel is cause for a procedural default. See Murray v. Carrier, 477 U.S. 478, 488 (1986); see also Williams v. Burt, 949 F.3d at 973 ("Generally speaking, counsel's deficient performance in state court can serve as grounds for excusing a petitioner's procedural default."). However, an appellate attorney is constitutionally ineffective only if (i) the attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal and (ii) there is a reasonable probability that the petitioner would have prevailed on appeal if his attorney had raised the issues. Smith v. Robbins, 528 U.S. 259, 285 (2000) (citing Strickland v. Washington, 466 U.S. 668, 687–691, 694 (1984)).

When assessing whether counsel's actions prejudiced the petitioner, the Court considers the strength of the claims that appellate counsel failed to raise. Carter v. Parris, 910 F.3d 835, 841 (6th Cir. 2018). "If there is no reasonable probability that inclusion of the issue would have changed the result of the appeal, then habeas relief will not be granted." Id. (punctuation modified, citation omitted).

### a. Failure to Move to Suppress the Pretrial Identification

Petitioner alleges that his trial attorney was ineffective for failing to move to suppress the pretrial identification of him. Petitioner contends that the identification was unnecessarily suggestive because he was the only person in both the photo array that was shown to Sutton and

the subsequent physical line-up.  Petitioner also asserts that there was no independent basis for the in-court identification because Sutton did not recognize the man who was seated next to him in the car before and after the shooting, and Sutton learned from someone on the streets that the third man was "CJ" or LeSears.

To prevail on a claim about trial counsel, Petitioner must show that his "counsel's performance was deficient" and "that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687.  The deficient-performance prong requires showing "that counsel's representation fell below an objective standard of reasonableness." Id. at 688.

The "prejudice" prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.  Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

To her credit, Petitioner's trial attorney moved to suppress Petitioner's statement to the police on the basis that Petitioner did not know the purpose of the lineup and did not have counsel present during the interviews with Sergeant Brown.  See 4/20/11 Suppression Hr'g Tr. at PagID.591–594, 598–599 (Dkt. 6-8).  Although trial counsel did not challenge the suggestiveness of the pretrial identification, there was additional evidence, besides Sutton's testimony, that Petitioner was involved in the shooting.  In the trial court's words, Petitioner "gave a recorded statement to the police on June 23, 2010, the video and transcript of which was admitted into evidence at trial, where [he] admitted to being in the car with Co-Defendants, getting out of the

car, and shooting his gun 'to the ground,' and 'play[ing] like [he] shot at [the victim].'"   See Op. and Order Denying Defendant's Mot. for Relief from J., at PageID.1278 (Dkt. 16-3).

The trial court concluded that there was not a reasonable probability that the proceedings would have been different had defense counsel moved to suppress Sutton's pretrial identification of Petitioner.   See id.   The court also stated that, because Petitioner's identity was not an issue at trial, moving to suppress the pretrial identification would have been futile.   See id.

For the reasons given by the state trial court, this Court agrees that a motion to suppress the pretrial identification would have been futile.   "[T]he failure to make futile objections does not constitute ineffective assistance."   Altman v. Winn, 644 F. App'x 637, 644 (6th Cir. 2016). Therefore, trial counsel was not ineffective for failing to move to suppress the pretrial identification of Petitioner, and appellate counsel was not ineffective for failing to raise Petitioner's claim about trial counsel during the direct appeal.   Petitioner has failed to establish "cause" for his procedural default of not raising his claim about trial counsel during his direct appeal.

### b.  The Prosecutor

The fifth habeas claim alleges that the prosecutor deprived Petitioner of a fair trial by eliciting inflammatory evidence regarding threats that Petitioner's co-defendants made to Sutton. Petitioner alleges that the threats were not connected to him and that defense counsel's failure to object to the evidence constituted ineffective assistance.

Sutton, however, made it very clear that, while Dixon had threatened to kill him, and Robinson had agreed with Dixon, Petitioner remained silent at the time.   See 4/28/11 Trial Tr. at PageID.896 (Dkt. 6-11).   Furthermore, Petitioner himself admitted in his statement to Sergeants

Brown and Collins that his co-defendants told Sutton "it was gonna happen to him too" if Sutton said something about the shooting.  See 6/23/10 Statement of Calvin Jerome Lesears at PageID.150 (Dkt. 5-1).

 Petitioner also indicated to Sergeants Brown and Collins that he was afraid of Robinson and Dixon.  See id. at PageID.151; see also 5/4/11 a.m. Trial Tr. at PageID.1147 (Dkt. 6-13).  Given this evidence, the prosecutor's use of evidence about the threats did not prejudice Petitioner.  It follows that trial counsel was not ineffective for failing to object to the evidence, and appellate counsel was not ineffective for failing to raise the issue on appeal.  Petitioner has not shown "cause" for his procedural default.

### c. Excluding the Public

The sixth habeas claim alleges that the exclusion of the public from Petitioner's trial violated his constitutional right to a public trial.  In the alternative, Petitioner argues that defense counsel was ineffective for failing to object to the closure of the courtroom.

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial . . . ."  U.S. Const. amend. VI.  "[T]his right extends to the States," Presley v. Georgia, 558 U.S. 209, 212 (2010), and under Waller v. Georgia, 467 U.S. 39, 48 (1984), the closure must be no broader than necessary to protect an overriding interest that is likely to be prejudiced without the closure.  "[A] violation of the right to a public trial is a structural error," but "there are some circumstances when [courtroom closure] is justified," and the right to a public trial "is subject to exceptions."  Weaver v. Massachusetts, 137 S. Ct. 1899, 1908–1909 (2017).  In short, not every public-trial violation leads to a fundamentally unfair trial.  Id. at 1909, 1911.

At Petitioner's trial, the trial court closed the courtroom to the public when a cell phone rang and no one admitted to possessing the phone. See 4/28/11 Trial Tr. at PageID.855 (Dkt. 6-11). However, a serious incident involving spectators occurred in the courtroom and nearby on the previous day when Dixon's mother collapsed, and Dixon's brother tried to help their mother. See 4/27/11 Trial Tr. at PageID.703–707 (Dkt. 6-10). Although the trial court could have taken a less drastic approach to the problem, the closure lasted for only two and one-quarter hours at the beginning of Sutton's testimony. Sutton resumed his testimony on the following day when the courtroom was once again open to the public. The closure on the previous day did not affect the fairness of the trial because all three defense attorneys were able to cross-examine Sutton, and there is not a reasonable probability that the result of the trial would have been different if the trial court had kept the courtroom open to spectators throughout the trial.

It also appears that an objection to the trial court's closure of the courtroom would have been futile because Dixon's attorney asked for permission to approach the trial judge immediately after the courtroom was cleared, and the judge responded: "This is my courtroom, sir. Everyone will leave." See 4/28/11 Trial Tr. at PageID.855 (Dkt. 6-11). "[F]ailing to make a futile motion is neither unreasonable nor prejudicial." Jacobs v. Sherman, 301 F. App'x 463, 470 (6th Cir. 2008) (citing Strickland, 466 U.S. at 687). Therefore, trial counsel was not ineffective, and appellate counsel did not act unreasonably in failing to raise Petitioner's claims about the courtroom closure and trial counsel's failure to object to the closure. Petitioner has not shown "cause" for his procedural default concerning his sixth claim.

### 3.  Prejudice and Miscarriage of Justice

The Court need not determine whether the alleged constitutional errors prejudiced Petitioner, because he has failed to show cause for his failure to comply with state law.  See Smith v. Murray, 477 U.S. 527, 533 (1986); Simpson v. Jones, 238 F.3d 399, 409 (6th Cir. 2000).

In the absence of "cause and prejudice," a habeas petitioner may pursue a procedurally defaulted claim if he can demonstrate that failure to consider his claim will result in a fundamental miscarriage of justice.  Coleman v. Thompson, 501 U.S. 722, 750 (1991).  "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'"  Lundgren v. Mitchell, 440 F.3d 754, 764 (6th Cir. 2006) (citing Carrier, 477 U.S. at 496).  To be credible, a claim of actual innocence requires Petitioner to support his allegations of constitutional error with "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."  Schlup v. Delo, 513 U.S. 298, 324 (1995).

Petitioner has not supported his constitutional claim with new and reliable evidence of actual innocence.  Therefore, a miscarriage of justice will not result from the Court's failure to address the merits of Petitioner's fourth, fifth, and sixth claims.  Those claims are procedurally defaulted because all four factors of a procedurally defaulted claim are satisfied.

### E.  Appellate Counsel

Petitioner's seventh and final claim raises an independent claim about Petitioner's appellate attorney.  Petitioner asserts that counsel was constitutionally ineffective for failing to raise significant and obvious issues and that the omitted issues were stronger than the issues counsel raised on direct appeal.  See Brief in Support of Am Pet. at PageID.1963–1966.

The state trial court addressed this issue during the post-conviction proceeding and disagreed with Petitioner's contention that the issues raised in his motion were stronger than the issues raised on appeal. According to the trial court, Petitioner had not demonstrated that his attorney's performance was deficient, and he did not establish that, but for any errors, the result of the proceedings would have been different.

This Court reaches a similar conclusion. For the reasons given above in the brief discussion of claims four through six, those claims are not stronger than the claims appellate counsel raised on direct appeal, and there is not a reasonable probability that inclusion of the issues on appeal would have changed the result of the appeal. Therefore, appellate counsel was not ineffective, and the trial court's rejection of Petitioner's claim about appellate counsel was objectively reasonable. As none of Petitioner's claims merit relief, the petition will be denied.

## IV. CERTIFICATE OF APPEALABILITY AND
## LEAVE TO APPEAL IN FORMA PAUPERIS

Before Petitioner may appeal this decision, the Court must determine whether to issue a certificate of appealability. See 28 U.S.C. § 2253(c)(1)(A); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy § 2253(c)(2), Petitioner must show "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (punctuation modified, citations omitted). The Court finds that reasonable jurists would not debate the resolution of any of Petitioner's claims. The Court, therefore, denies a certificate of appealability.

Insofar as Petitioner requests permission to appeal in forma pauperis, the Court denies the request, because any appeal of this decision would be frivolous and could not be taken in good faith.  28 U.S.C. § 1915(a)(3).

## V. CONCLUSION

For the reasons set forth above, the Court denies the amended petition for a writ of habeas corpus, denies a certificate of appealability, and denies leave to appeal in forma pauperis.

SO ORDERED.

Dated:  July 30, 2021  s/Mark A. Goldsmith
     Detroit, Michigan  MARK A. GOLDSMITH
                                       United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 30, 2021.

s/Karri Sandusky
Case Manager